**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MONIQUE Y. HOWARD,

      Plaintiff,

v.

ST. JOHN MEDICAL CENTER, INC.,

      Defendant.

Case No. 25-CV-00196-SEH-JFJ

## OPINION AND ORDER

Before the Court is Defendant St. John Medical Center, Inc.'s ("St. John's")

motion for summary judgment. [ECF No. 77]. Plaintiff Monique Howard,

proceeding pro se, brings employment law claims against St. John's, alleging

race and age discrimination (counts I, III), retaliation (count II), and hostile

work environment (count IV), under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e et seq. ("Title VII") and the Age Discrimination in

Employment Act, 29 U.S.C. § 621 et seq. ("ADEA").[1] [ECF No. 70]. St. John's

argues that it is entitled to summary judgment because Howard fails to show

any dispute of material fact. [ECF No. 77 at 3].

---

[1] Howard further asserts a claim of "wrongful termination in violation of Title VII and the ADEA," but the Court finds it duplicative of her other claims. [ECF No. 70 at 12–13].

In response, Howard argues that St. John's treated her "less favorably than non-Black coworkers" and subjected her to "age related remarks in the workplace," raising an inference of discrimination.[2] [ECF No. 85 at 20, 21]. In support of her retaliation claim, Howard argues that St. John's denied her transfer opportunities, placed her on a PIP, and terminated her employment only after she complained of discrimination. [*Id.* at 21]. Howard contends that St. John's asserted reason for her termination is pretextual because she "sharply dispute(s)" its stated reason for terminating her employment, St. John's "shifted" its explanation of who initially reported her alleged time-clock fraud, she received an unfair investigation, and St. John's "selectively ignores" evidence of her positive work performance. [*Id.* at 1–2, 22–23]. She further contends that St. John's subjected her to a hostile work environment by failing to take "prompt corrective action" when she complained of "sabotage, gossip, refusal to train, yelling, intimidation, exclusion, targeted micromanagement, denial of support, hostile comments, and efforts to create a false record of poor performance." [*Id.* at 22].

---

[2] Because Howard proceeds pro se, the Court construes her arguments liberally, but "cannot take on the responsibility of serving as [her] attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

The Court finds that St. John's is entitled to summary judgment. Assuming for the purposes of this order that Howard shows prima facie cases of discrimination and retaliation, she fails to present any evidence of pretext. For her hostile work environment claim, Howard has not presented sufficient evidence of conduct that reaches the level of severity or pervasiveness required within this Circuit. Therefore, she has not shown a disputed issue of material fact relating to any of her claims. For these and other reasons explained below, St. John's motion for summary judgment is granted.

## I. Summary Judgment Evidence

As an initial matter, the Court must determine what evidence it may consider for summary judgment. Under Fed. R. Civ. P. 56(c)(2) and (4), St. John's objects to multiple exhibits Howard submitted with her response. [ECF Nos. 86, 95]. Rule 56(c)(2) provides that a party may object to material cited to support or dispute a fact on the basis that the material would not be admissible in evidence. Under subsection (4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." St. John's objects to the admissibility of most of Howard's exhibits and asks the Court to disregard them for purposes of summary judgment. [ECF No. 95]. Howard

has not responded to St. John's objections, but the Court will nonetheless consider each, in turn.

### A. Howard's Sworn Declaration [Exhibit A]

First, St. John's objects to the following portions of Howard's sworn declaration [ECF No. 95 at 1–3]:

*Paragraph 11*: St. John's objects to Howard's sworn statement that "Before that PIP, I was not given consistent coaching or specific corrective guidance regarding the alleged issues" as being inconsistent with her deposition testimony. [*Id.* at 1; ECF No. 86 at 5]. "A 'sham affidavit' is one which makes a statement directly contrary to previous sworn testimony in an attempt to defeat summary judgment by manufacturing a dispute of material fact." *Carbajal v. St. Anthony Cent. Hosp.*, No. 12-cv-02257-REB-KLM, 2015 WL 3896902, at *3 n.7 (D. Colo. June 23, 2015). Cases with sham affidavits are "unusual." *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009). "The threshold question is whether a declaration conflicts with the declarant's prior sworn testimony." *Ibarra v. Lee*, No. 22-5094, 2023 WL 6939236, at *3 (10th Cir. Oct. 20, 2023). Here, St. John's points to Howard's testimony that she met with her supervisor weekly to discuss her progress as being inconsistent with her declaration. [ECF No. 95 at 1; ECF No. 77-1 at 8]. The Court agrees.

However, that is not the end of the analysis. When deciding "whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). "If there is a conflict, the next question is whether the declaration 'is simply an attempt to create a sham fact issue.'" *Ibarra*, 2023 WL 6939236, at *3 (quoting *Law Co. Inc.*, 577 F.3d at 1169). To determine if an affidavit or declaration attempts to create such a sham fact issue, the court should evaluate whether: "(1) the affiant was cross-examined during [her] earlier testimony; (2) the affiant had access to the pertinent evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Law Co. Inc.*, 577 F.3d at 1169 (cleaned up).

These factors show that Howard's statement in her declaration should be disregarded in considering summary judgment. She was carefully cross-examined when she gave her deposition testimony, and as a participant in the weekly meetings with her supervisor she had access to the relevant evidence at that time. Moreover, her sworn declaration makes no reference to her earlier unequivocal statement. Under these circumstances, the Court concludes that "this is one of those unusual cases in which the conflict

between the testimony and the affidavit raises only a sham issue." *Franks*, 796 F.2d at 1237. St. John's objection is sustained.

*Paragraphs 12–14*: Next, St. John's objects to out-of-court-statements allegedly made by Howard's coworkers on the basis that the statements are hearsay. St. John's also contends that Howard's statement that "Angelique Brown told management to interview people about my complaints" is also hearsay and not based on Howard's personal knowledge. [ECF No. 85 at 2]. The Court agrees and sustains St. John's objections.

The opinion testimony of Howard's coworkers is presented for the truth of the matter asserted and is neither relevant nor admissible. Fed. R. Evid. 401–02, 701, 801–02. And Howard's statement about what Ms. Brown allegedly told others is further hearsay and not based on Howard's personal knowledge. Fed. R. Evid. 601, 801–02.

Moreover, as to paragraph 14, St. John's cites notes of Howard's interview to show her statement that she was not interviewed to be false. [ECF No. 95 at 2; ECF No. 86 at 5, 152]. St. John's further contradicts Howard's statement with Mr. Amagna's sworn declaration. [ECF No. 85 at 2; ECF No. 77-2 at ¶ 4]. St. John's objections in relation to these paragraphs are sustained.

*Paragraphs 22–26*: St. John's objects to the paragraphs of Howard's declaration concerning findings by the Oklahoma Employment Security

Commission ("EEOC"), arguing that EEOC findings are not binding on this Court and not relevant to this proceeding. [ECF No. 95 at 2]. The Court agrees, sustains St. John's objection, and will not consider these paragraphs in determining summary judgment.

### B.  Exhibits B, C, D, E, F, G, H, K, M, N, T, U, and Z

St. John's broadly objects to these exhibits under Fed. R. Evid. 106 and 901. [ECF No. 95 at 3]. St. John's argues that the exhibits "have not been authenticated as true and correct copies by any witness testimony in the form of a deposition or declaration," and are "made up of unrelated, incomplete, and/or partial documents." [*Id.*]. St. John's asks that these exhibits be disregarded because they are not presented in a form that shows they are authentic and reliable. [*Id.*].

The Court finds that many of the exhibits match attachments to St. John's summary judgment motion or are presented in a form that shows them to be reliable. Therefore, St. John's objections to the following exhibits are overruled: B, C, D, E, F (not including page 24), H, K, M, U, and Z.

The Court sustains St. John's objections to the following exhibits for the reasons St. John's presents: F (page 24 only), G, N, T.

### C. Deposition Errata Sheet [Exhibit I]

St. John's objects to Howard's use of the errata correction sheet to substantively change her deposition testimony. [ECF No. 95 at 3–4]. Under

Fed. R. Civ. P. 30(e), deponents may review their depositions and make corrections. However, material changes made under Rule 30(e) are reviewed in the same context as sham affidavits. *Sinclair Wyoming Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 784–85 (10th Cir. 2021). Here, the errata sheet shows an attempt by Howard to substantively change her deposition testimony. She adds testimony for questions that she had already answered completely, changes her answers from "I don't recall" to "I recall," and significantly changes her responses to questions related to the PIP and to her termination. [ECF No 86]. Howard had access to all the evidence in support of her case at the time of her testimony, and her changes are not based on newly discovered evidence or confusion. St. John's objection is sustained.

### D. "Summary Transcripts" [Exhibits P, Q and S]

St. John's further objects to exhibits Howard labels as transcripts or summaries. [ECF No. 95 at 4–5; ECF No. 86 at 93–96, 102]. The summaries are purported to be "recorded conversations" and appear to have been created by Howard herself. Exhibit Q does not list Howard as a participant in the conversation, and it is unclear from its contents how she would have had any knowledge of the events the exhibit describes. St. John's argues that these exhibits are uncertified and unreliable and should be excluded under Fed. R. Civ. P. 56(c)(4), Fed. R. Evid. 601, 801–2, and 901. The Court agrees and sustains St. John's objections.

### E. Monica Stockton's Declaration [Exhibit R]

St. John's objects to the sworn declaration of Monica Stockton on the basis that it presents irrelevant opinion testimony. [ECF No. 95 at 5–6]. Ms. Stockton's sworn statement shows that she was employed by St. John's from May 8, 2023, to June 30, 2023. [ECF No. 86 at 98, ¶ 1]. She states that she was in the same orientation group as Howard and alleges that she experienced "heightened scrutiny, unequal training, and adverse treatment directed toward older African American nurses." [*Id.* at ¶ 2]. She further describes an incident when another nurse raised her voice at her and states that "[n]o corrective action was taken" after she reported the incident to Mallory Shawnee and Mr. Amagna. [*Id.* at ¶ 4]. According to Ms. Stockton's declaration, she met with Ms. Shawnee and Mr. Amagna on June 30, 2023 to discuss alleged performance concerns and she resigned at the conclusion of that meeting. [*Id.* at ¶¶ 5–9].

"[A]necdotal evidence of discrimination should only be admitted if 'the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand.'" *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999), abrogated on other grounds as recognized in *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1227 (10th Cir. 2014)). A plaintiff "can meet this

9

requirement by showing that the same supervisors were involved in prior discriminatory employment actions." *Id.* And the court "should carefully scrutinize the time frame in which other alleged acts of discrimination occurred." *Id.* "Finally, stray racial comments should typically not be admitted unless the plaintiff can link them to personnel decisions or the individuals making those decisions." *Id.* (citations omitted).

Here, St. John's argues that Howard fails to connect Ms. Stockton's experiences before her resignation on June 30, 2023 to her own experiences, discipline, or discharge. [ECF No. 95 at 5–6]. The Court agrees. Howard testified that she did not work with Ms. Stockton on the sixth floor, Ms. Stockton did not report to the same supervisor, Ms. Merciez, and she does not know what Ms. Stockton meant when referring to discrimination in a statement she provided to Howard. [ECF No. 77-1 at 34–38]. Ms. Stockton also voluntarily resigned her employment with St. John's on June 30, 2023, while Howard's alleged claims arise from conduct she experienced on the sixth floor beginning August 28, 2023. Ms. Stockton's declaration is inadmissible under Fed. R. Evid. 401, 402, 403, and 701. Accordingly, the Court sustains St. John's objection.

### F. Exhibit V

St. John's objects to pages 118–27 of Exhibit V on the basis that Howard's "submission of contemporaneous notes" contradicts her deposition testimony,

is unreliable hearsay, and has not been authenticated. [ECF No. 95 at 6]. St. John's argues that paragraphs 7–10, 15–16, and 18 are inadmissible hearsay to which Howard did not testify. [*Id.*]. As to pages 128–38, St. John's objects on the ground the text messages have not been authenticated. [*Id.*]. The Court agrees that this exhibit is inadmissible under Fed. R. Evid. 801–02 and 901. The Court sustains St. John's objection and will not consider Exhibit V in its summary judgment determination.

### G. Exhibit X, AD, and AF

Finally, St. John's objects to Howard's exhibits that contain portions of its response to her EEOC Charge (Exhibit X), an email between Ms. Merciez and Associate Relations Specialist Tammy Gasperich (Exhibit AD), and its answers to supplemental interrogatories (Exhibit AF). [ECF No. 95 at 6]. St. John's argues that these exhibits are inadmissible under Fed. R. Evid. 106 because they are incomplete or contain only a portion of the document used. [*Id.*].

Fed. R. Evid. 106 provides that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." St. John's is not asking that the remaining portion of these documents be introduced. Rule 106 is a rule of completeness that "functions as a defensive shield against potentially misleading evidence

proffered by an opposing party." *Echo Acceptance Corp. v. Household Retail Services, Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001). The Court does not find these exhibits inadmissible under Rule 106. However, because the Court has previously ruled that evidence related to EEOC findings is not relevant, St. John's objection to Exhibit X is sustained. It's objections to Exhibits AD and AF are overruled.

### H. Howard's Attempt to Controvert Facts

St. John's submits 55 facts as undisputed, in concise, numbered paragraphs that are properly supported by record citations. [ECF No. 77 at 3–55]. Although Howard states that she disputes many of St. John's undisputed facts, her explanations show she objects only to St. John's characterization. [*See, e.g.*, ECF No. 85 at UMF Nos. 2–4, 10–11, 13, 15–16, 19, 22–26, 28, 30–31, 33–34, 36, 39, 42–44, 46–48, 50, 53 (disputed "to the extent Defendant implies" or "characterizes" specific evidence)]. For the most part, Howard's statements contain her own self-serving characterization of the record evidence. [*See, e.g.*, *id*.].

A party disputing a fact must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). If a party fails to address properly another party's summary-judgment facts, "the court may ...consider

the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); *Coleman v. Blue Cross Blue Shield of Kan., Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) ("Faced with pleadings that did not comply with either the local practice rule or summary judgment practice in general, the district court was correct to admit all facts asserted in [defendant's] summary judgment motion that are not controverted by a readily identifiable portion of the record." (cleaned up)).

As shown above, the Court sustains objections to many of the materials Howard relies on in her attempt to controvert St. John's undisputed facts. To the extent Howard cites material that has been excluded, her objections are not properly supported by the record and the Court will consider that fact undisputed for purposes of St. John's motion.

Occasionally, Howard attacks St. John's cited support directly. [*See, e.g.*, ECF No. 85 at UMF No. 54]. But many of her attempts to controvert facts fall short because she either cites facts that are immaterial or submits unsupported opinions. "Unsubstantiated allegations carry no probative weight in summary judgment proceedings. To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 481 (10th Cir. 2011) (quotation omitted).

Therefore, Howard's immaterial facts and unsupported opinions cannot stand in the way of summary judgment.

Howard also submits 25 facts as undisputed, in concise, numbered paragraphs that cite to the record. [ECF No. 85 at 14–19]. St. John's disputes many on the basis that they are recharacterizations of its evidence and are not facts supported by admissible evidence. [ECF No. 94 at 1–5]. The Court has already addressed St. John's objections to the admissibility of the evidence Howard cites and will not reconsider the admissibility of that evidence here. Thus, the Court will not consider facts supported only by inadmissible evidence or Howard's unsupported opinion in determining summary judgment.

Rather than making a broad statement about these facts, the Court identifies below the facts that control St. John's motion. They consist of undisputed facts and, sometimes, disputed facts, that are expressed in the light most favorable to Howard—the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## II. Background

St. John's Director of Nursing, Nathan Paris, and Operating Room Manager, Mark Amagna, interviewed Howard over Zoom in March 2023 and decided to hire her for an RN circulator role, effective April 17, 2023. [ECF No. 77-2 at 2; ECF No. 85 at UMF No. 1]. During her time at St. John's,

Howard was assigned to two different surgical floors. [ECF No. 77-5 at 3, ¶¶ 4–5; ECF No. 85 at UMF No. 5]. As a nurse assigned to a surgical floor, Howard's job duties included preparing operating rooms, supplies, and patients for surgery. [ECF No. 77-1 at 10; ECF No. 77-5 at 3, ¶ 6; ECF No. 85 at UMF No. 6].

RN Nursing Supervisor Annie Merciez supervised Howard on the sixth floor from August to December 2023. [ECF No. 77-5 at 3, ¶ 4; ECF No. 85 at UMF No. 9]. Ms. Merciez met with Howard frequently and acknowledged that she needed additional weeks of orientation and continued coaching. [ECF No. 77-1 at 8; ECF No. 77-5 at 3, ¶ 8; ECF No. 85 at UMF No. 10]. During these meetings, Ms. Merciez discussed with Howard alleged negative feedback she had received from doctors and coworkers about Howard's job performance. [ECF No. 77-1 at 9; ECF No. 85 at UMF No. 11].

On September 7, 2023, Ms. Merciez sent an email to Mr. Paris and Mr. Amagna detailing feedback she had received from St. John's staff about Howard's work performance. [ECF No. 86 at 160 (Exhibit AE)]. The feedback included:

- Continues to contaminate sterile supplies (often)
- Needs help when opening sterile supplies
- Dr. Flynn asked Monique to read back each specimen and said that Monique would add a word,
  leave a word out, or ask Dr. Flynn to repeat herself multiple times
- Missing times on specimens and not entering specimens into the chart
- Dr. Flynn questioned if she was even a nurse and asked if I had looked to validate her license
- Stubborn and doesn't receive feedback well; Attitude when corrected
- Monique starts prepping at the site marking, not the incision site (She has been told numerous
  times)
- Dr. Flynn said that Monique has no recollection of previous events & must repeat everything to her
- Doesn't know the equipment after multiple uses (Savi Scout & Neoprobe)
- Dr. Flynn said, "I would rather have Laurie in my room than Monique". -Dr. Flynn wanted to clarify
  that she is not asking to have Laurie.

[*Id.*]. Ms. Merciez stated that she would continue to ask for feedback and

provide updates. [*Id.*]. She further relayed, "My plan was to have [Howard]

on our next call schedule, but I'm not sure if this is safe for patient care. I

have offered to help [her] on anything that she may need clarification or

explanation on regarding anything. [She] has not asked for anything at this

time." [*Id.*]. Ms. Merciez ended the email by informing Mr. Paris and Mr.

Amagna that she planned to meet with Howard the next day to review the

previous two weeks and to share the feedback with her. [*Id.*].

About a week later, Ms. Merciez emailed Mr. Amagna about a planned

meeting she had with Howard later in the day. [ECF No. 86 at 148 (Exhibit

Z)]. She suggested an additional two weeks of orientation for Howard and

stated that Howard was "trying hard" and came to her "for questions when

necessary." [*Id.*]. Ms. Merciez said she planned on "placing [Howard] in

another combo" and would "coach her through it." [*Id.*]. She further said she

thought Howard needed assistance with certain tasks, additional training,

and "preceptors who will critique without being critical while providing positive feedback as well." [*Id.*].

Howard personally heard physicians and staff make negative comments about her work. [ECF No. 86 at 6, ¶¶ 15]. These comments included that she was "slow," that "every day is like a new day," and comments suggesting she had memory problems. [*Id.*]. She also heard comments that questioned her qualifications, whether she could work independently, and whether she had a valid nursing license. [*Id.*]. On one occasion, she heard her preceptor, J.P., make comments about older people, including that she did not like them because they "smell." [*Id.* at 6, ¶ 16].

On September 19, 2023, Howard sent a letter to Ms. Merciez about her "unfair treatment in the workplace." [ECF No. 77-10; ECF No. 85 at UMF NO. 13]. Howard described "rude and condescending" behavior from her preceptor, and stated that J.P. had spread gossip about her and refused to help or train her. [*Id.*]. She further stated that J.P. had told her she could have a lunch break when someone came to relieve her. [*Id.*]. Howard shared that J.P. told her she routinely arrived an hour before her shifts started to prepare for her cases. [*Id.*]. Because of J.P.'s early arrival, Howard said she could not learn how to pull medications. [*Id.*]. Howard ended the letter with, "I am willing to learn from her or anyone who will train me correctly. However, I don't want to be bullied or belittled." [*Id.*]. Howard testified that

St. John's "should have understood" this letter to be the first time she complained about racial discrimination. [ECF No. 77-1 at 14–15, 31–32].

Ms. Merciez received a variety of critical feedback and complaints about Howard's work performance throughout September, October, and November 2023. [ECF No. 77-5 at 3, ¶ 9; ECF Nos. 77-12–77-16, 77-20, 77-26, 77-27; ECF No. 86 at 154 (Exhibit AB), 165 (Exhibit AG)]. A September 29, 2023 evaluation stated that Howard arrived to rooms on time, prepped well, and had a "good time out." [ECF No. 77-14]. The same evaluation listed areas for improvement, such as Howard's need "to be more urgent," her need to "find[] the flow of the room," and her need to "figur[e] out the priority of the case." [Id.]. Howard also received positive evaluations during her time at St. John's. [ECF No. 86 at 12–17 (Exhibit C1–C6)].

On October 4, 2023, Howard reported to Ms. Merciez that a scrub tech, J.B., had yelled at her for miscounting surgical instruments. [ECF No. 77-1 at 11, 17; ECF No. 86 at 19 (Exhibit D)]. She described J.B. as becoming "angry and aggressive," and said J.B. "started slamming instruments on the pan while yelling and screaming to start over." [Id.]. Howard described the behavior as "lateral violence" and listed another nurse and her preceptors as witnesses to the alleged conduct. [Id.]. Howard further stated that J.B. "gossiped" about her and was "spreading negative untruths." [Id.].

On October 6, 2023, Associate Relations Specialist Tammy Gasperich, Ms. Merciez, and Mr. Amagna interviewed J.B. and Howard separately about the yelling incident Howard alleged. [ECF No. 77-1 at 11–12; 77-18 at ¶ 4; ECF No. 86 at 150–52 (Exhibit AA)]. According to Ms. Gasperich's notes from the interviews, J.B. admitted to raising her voice at Howard. [ECF No. 86 at 151 (Exhibit AA)]. The notes further reflect that J.B. heard Howard state, "I am gong [sic] to leave before I smack somebody," and that Mr. Amagna and Ms. Merciez would try to find out if there were any witnesses to this remark. [*Id*.]. The notes show that Howard's version of events was consistent with her letter. [*Id*. at 152]. They further show that Ms. Gasperich, Mr. Amagna, and Ms. Merciez took an opportunity during the interview to discuss with Howard specific concerns that had been raised by staff about her attitude and work performance. [*Id*.]. Howard was not informed of what discipline, if any, J.B. received. [ECF No. 77-1 at 17; ECF No. 85 at UMF No. 28].

The next day, Howard sent Ms. Merciez a letter in response to the interview. [ECF No. 86 at 21 (Exhibit E)]. She said she felt "intimidated" in the meeting and wished to work in "a hostile free environment without bullying, intimidation, gossip, character assassination[,] microaggression and racial discrimination." [*Id*.]. She described her weekly meetings with Ms. Merciez as mostly "negative and unsupportive in nature," and said Ms. Merciez's goals were "unrealistic and different than those of [her] coworkers."

[*Id.*]. She further stated that she had been in orientation for seven weeks and had been made to feel that she could not "ask for help without the fear of being reprimanded." [*Id.*]. Howard also said she "was advised by HR to not send any more letters which will communicate the discriminatory treatment that [she was] receiving from [Ms. Merciez's] staff." [*Id.*].

On October 17, 2023, Ms. Merciez issued a performance improvement plan ("PIP") to Howard. [ECF No. 77-5 at 5, ¶ 18; ECF No. 77-22]. The PIP addressed areas of concern related to Howard's performance and behavior and set performance goals and expectations for improvement. [ECF No. 77-22]. Two days later, Howard wrote a letter to Ms. Merciez in response to the PIP. [ECF No. 77-24]. She characterized the PIP as "unfair" and gave paragraph responses to each area of concern. [*Id.*]. In the last paragraph of her letter, Howard requested that the PIP "be rescinded due to its lack of validity, inaccuracy, unfairness, and discriminatory bias content." [*Id.* at 4]. She further stated, "I am being bullied and harassed by management and my colleagues due to my age of over 40 and African American/black descent." [*Id.*].

On October 25, 2023, Associate Relations Specialist Angelique Brown emailed Howard, informing her that she had received Howard's case. [ECF No. 77-25; ECF No. 86 at 27 (Exhibit F)]. Ms. Brown asked Howard to provide a statement with concrete examples of how Howard felt she had been

harassed by management and bullied by co-workers. [*Id.*]. She further requested that Howard inform her of how and why she felt she had been treated differently on account of her age and race. [*Id.*]. Howard responded two days later, stating that her "grievance concerning racism is ongoing." [ECF No. 86 at 23]. She described an incident from the day before where J.B. "was constantly saying things that were not true" and "was aggressive with her tone of voice." [*Id.*]. Howard stated that she told Ms. Merciez about this conduct and was ignored. [*Id.*]. Howard also provided that she was not given lunch until it was time for her to go home and that the nurse who relieved her "had an attitude." [*Id.*]. Howard stated, "My working environment is hostile every day" and "I am black and everyone else is white." [*Id.*].

Weeks later, Howard reported additional instances of what she believed to be discrimination due to her age and race. [ECF No 77-25]. She stated that she had "endured racism daily" because she was "treated differently" than her "white co-workers." [*Id.*]. As examples, she provided she was "barely assisted" by the other nurses, and that she did not get a lunch break one day and ate lunch late on another, while other nurses sat in a breakroom for hours. [*Id.*]. She further described a group of nurses "spreading negative rumors and gossip" about her work on the way to a meeting. [*Id.*]. Finally, Howard stated that she was "a black RN who [was] enduring racism due to [her] age," and explained that she heard J.P. make "negative comments in

the break room about old people and how she doesn't like to be around them."
[*Id*.].

On the morning of November 30, 2023, Howard clocked into work before briefly returning to her car to retrieve her work bag. [ECF No. 86 at 6, ¶ 18]. Her nursing shift began at 6:15 a.m. [ECF No. 77-1 at 22; ECF No. 85 at ¶ 40]. Employees were generally expected to use a 10-minute grace period to change into scrubs, attend huddle, and report to their assigned surgical room. [ECF No. 85 at 11, UMF No. 43]. That morning, Howard reentered the building at approximately 6:19 a.m. [ECF No. 85 at 18, ¶ 17; ECF No. 94 at 4, ¶ 17]. St. John's has a policy providing that employees who are "not at their assigned location ready to work at the specified beginning of their shift" are considered tardy. [ECF No. 77 at 10, ¶ 46; ECF No. 77-29 at 4; ECF No. 85 at 12, UMF No. 46]. The same policy provides that "falsification of time records may be grounds for immediate termination." [ECF No. 77 at 10, ¶ 47; ECF No. 77-29 at 1; ECF No. 85 at 12, UMF No. 47]. The same policy instructs employees to "[c]lock out when leaving the work premises for any reasons," and that "[f]ailure to do so will be cause for discipline." [ECF No. 86 at 69]. St. John's has another policy stating that "[f]alsifying or unauthorized altering of any records," including "time cards" "shall be grounds for corrective action up to and including termination, even for the first offense."

[ECF No. 77 at 10, ¶ 48; ECF No. 77-30 at 7, 9; ECF No. 85 at 12, UMF No. 48].

On December 5, 2023, Mr. Amagna and Ms. Merciez met with Howard to discuss her timekeeping and return to her car on November 30th. [ECF No. 86 at 6, ¶ 20]. After showing her video footage, Mr. Amagna and Ms. Merciez informed Howard that her employment was terminated for falsification of time. [ECF No. 86 at 6, ¶¶ 20–21, 167 (Exhibit AE); ECF No. 77-31; ECF No. 85 at 12, UMF No. 50]. Neither Mr. Amagna nor Ms. Merciez made racial or age-related comments to Howard. [ECF No. 85 at 13, ¶¶ 53–54, UMF Nos. 53–54; 77-1 at 26–27].

On May 13, 2024, Howard filed a charge of discrimination with the EEOC, asserting age and race discrimination, retaliation, and hostile work environment claims. [ECF No. 86 at 89; ECF No. 77-1 at 42]. She received a right to sue letter on January 21, 2025 and filed this case in federal court 90 days later. [ECF No. 1].

Howard's operative complaint asserts Title VII and ADEA claims of race and age discrimination, retaliation, and hostile work environment. [ECF No. 70]. St. John's moves for summary judgment on all claims. [ECF No. 77].

### III. Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing law." *Id.* at 248.

In applying the summary judgment standard, a court must view facts in the light most favorable to the non-moving party. *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1059 (10th Cir. 2023). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The Court's role at the summary judgment stage is not to weigh the evidence or resolve any disputed issues in favor of the moving party. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (discussing a "judge's function" at summary judgment). Rather, a court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*

477 U.S. at 251–52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

The moving party has the initial burden of showing that no genuine dispute of material fact exists. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). The movant "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citation and internal quotation marks omitted). If the movant carries its initial burden, "the burden shifts to the nonmovant to ... set forth specific facts ... from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (citations and internal quotation marks omitted). The nonmovant must set forth facts "by reference to affidavits, deposition transcripts, or specific exhibits …." *Id.* (citing *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), cert. denied, 506 U.S. 1013 (1992)). "In response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Am. Soc'y of Home Inspectors, Inc. v. Int'l Ass'n of Certified Home Inspectors,*

36 F.4th 1238, 1244 (10th Cir. 2022) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

## IV. Discussion

### A. *Howard has not presented evidence of pretext for her discrimination claims.*

St. John's argues that it is entitled to summary judgment on Howard's discrimination claims, because she cannot make a prima facie case of age or race discrimination and presents no evidence of pretext. [ECF No. 77 at 12–21]. Howard responds that she has presented evidence that she was "treated less favorably than non-Black coworkers," and that "age-related remarks" were made in the workplace in front of and about her. [ECF No. 85 at 20–21]. She further responds that she has presented evidence she was replaced with a younger white nurse on the day of her termination. [*Id.* at 21].

Howard has no direct evidence of race or age discrimination. In reviewing a discrimination claim based on circumstantial evidence, the Court must apply the burden-shifting framework set forth in *McDonnell Douglas*, 411 U.S. 792 (1973). *Jiang v. City of Tulsa*, 169 F.4th 1194, 1056–59 (10th Cir. 2026) (applying *McDonnell Douglas* burden-shifting framework to ADEA and Title VII claims). Under this framework, the plaintiff bears the initial burden to establish a prima facie case of discrimination. *Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008). To show a prima facie case of race

discrimination under Title VII, a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022). A claim of age discrimination under the ADEA requires a plaintiff to show (1) she is a member of the class protected by the ADEA, (2) she suffered an adverse employment action, (3) she was qualified for the employment position at issue, and (4) she was treated less favorably than others not in the ADEA protected class. *Roberts v. Winder*, 16 F.4th 1367, 1384 (10th Cir. 2021) (citing *Jones v. Oklahoma City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010)). A plaintiff suing under the ADEA must also show age was a but-for cause of the challenged employment action. *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080–81(10th Cir. 2023).

If the plaintiff meets her burden, the employer must "come forward with some legitimate, non-discriminatory reason for the adverse employment action." *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008). At this stage, the defendant need not "litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quotation omitted). "This stage of the

analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited" and that is "reasonably specific and clear." *Id.* (quotation and brackets omitted). The Tenth Circuit has described the defendant's burden at this stage as "exceedingly light." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007).

If the employer produces a legitimate, nondiscriminatory reason for its decision, the burden shifts to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons but were a pretext for discrimination." *Roberts*, 16 F.4th at 1384 (citation omitted). "A plaintiff demonstrates pretext by showing … that the employer's proffered explanation is unworthy of credence." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218 (10th Cir. 2003) (quotation omitted). This burden can typically be satisfied "by showing the proffered reason is factually false … or by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason 'unworthy of credence.'" *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (cleaned up). A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment. *Branson v. Price River Coal Co.*, 853 F.2d 786, 772 (10th Cir. 1988).

Assuming without deciding that Howard has met her prima facie burden, the Court will proceed to step two of the framework. *See*, *e.g.*, *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (assuming without deciding plaintiff established prima facie showings of discrimination and retaliation). In doing so, the Court also assumes without deciding that the adverse employment actions Howard has shown are the issuance of the PIP and termination of her employment. *See Scherr v. Sisters of Charity of Leavenworth Health System, Inc.*, 144 F.4th 1212, 1216 (10th Cir. 2025) (remanding for the district court to determine whether conditions of a PIP left the plaintiff worse off under *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)).

St. John's cites Howard's poor work performance as its legitimate, nondiscriminatory reason for placing her on a PIP, and timecard falsification as its legitimate, nondiscriminatory reason for terminating her employment. [ECF No. 77 at 15, 21]. As to the PIP, Ms. Merciez prepared a sworn statement describing Howard's deficiencies, her lack of improvement, and her failure to complete tasks. [ECF No. 77-5 at 3, ¶¶ 9–17]. These descriptions are supported by other evidence in the record, including emails, evaluations, and Howard's testimony that Merciez shared negative feedback with her weekly that had been received from doctors and co-workers. [ECF Nos. 77-12–77-15, 77-20, 77-26, 77-27, 77-1 at 9].

Ms. Merciez's sworn statement also describes the circumstances surrounding Howard's termination. [ECF No. 77-5 at 5–6, ¶¶ 20–27]. Mr. Amagna also prepared a sworn declaration explaining the circumstances that led to terminating Howard's employment with St. John's. [ECF No. 77-2 at 3, ¶¶ 5–10]. These statements are similarly supported in the record by emails, company policy, security footage, and Howard's own admission that she swiped her timecard and returned to her car before returning to work. [ECF Nos. 77-28, 77-29, 77-30, 77-31, 86 at 140–141, 85 at 11, ¶42]. Therefore, St. John's has sufficiently articulated legitimate, non-discriminatory and non-retaliatory reasons for the PIP and for the termination.

To establish that those proffered reasons are pretextual, Howard points to four things: (1) the fact she did not intend to falsify time; (2) St. John's shifting explanations about how it learned of her alleged timecard conduct on November 30, 2023; (3) unfair investigation of her complaints; and (4) ignoring evidence of positive performance. [ECF No. 85 at 22–23]. She additionally raises pretext in some of her responses to St. John's list of undisputed material facts. Interpreting those responses in the light most favorable to Howard, the Court finds she raises two additional arguments concerning whether St. John's reasons for placing her on a PIP and terminating her were pretextual: timing and disparate treatment. [*Id.* at 12, ¶ 49; 17, ¶ 15]. The Court will address each in turn.

First, whether Howard intended to falsify her time is not relevant to the pretext determination. In considering whether an adverse employment action was pretextual, a court "do[es] not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Sanders v. TC Transcontinental Tulsa*, No. 25-5022, 2026 WL 1256902, at *4 (10th Cir. May 7, 2026) (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007)). The Court must examine "the facts as they appear to the person making the decision to terminate [Howard]." *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (quotation and citations omitted). And a court considering evidence of pretext may not "second guess" the employer's business judgment. *Plump v. Gov't Emps. Ins. Co.*, 161 F.4th 1222, 1236 (10th Cir. 2025) (quotation omitted). Whether Howard meant to falsify her time has no bearing on whether St. John's stated reason for terminating her employment was held in good faith; therefore, it does not show pretext.

Second, the Court is not convinced St. John's shifted its explanations for terminating Howard. "Inconsistency evidence … has traditionally been associated with proving pretext." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) (emphasis omitted). But Howard cites St. John's position statement to the EEOC and its answer to an interrogatory in her

31

attempt to show an inconsistency. The Court has already determined that it will not consider EEOC filings for purposes of this order. And St. John's interrogatory response identifies the name of the nurse who told Ms. Merciez that Howard was not where she was expected to be on November 30, 2023. [ECF No. 86 at 162]. This does not show St. John's set forth any reason for terminating Howard other than timecard falsification. Therefore, Howard has shown no inconsistency.

Third, Howard's argument that a jury could find pretext based on unfair investigations is similarly unsupported by the record. The email Howard cites in support of her argument is dated October 9, 2023 and discusses whether meeting with two witnesses is necessary. [ECF No. 86 at 158 (Exhibit AD)]. The Court finds the email to be in reference to Howard's complaint about J.B. yelling at her. This conclusion is supported by Howard's written complaint about this incident, Ms. Gasperich's sworn statement, and Ms. Gasperich's notes about investigating Howard's complaint. [ECF Nos. 77-17, 77-18, 77-19]. The notes show that J.B. admitted she raised her voice at Howard. [ECF No. 77-19 at 3]. And they further show that Mr. Amagna and Ms. Merciez planned to try to find witnesses to corroborate J.B.'s allegation that she heard Howard state "I am gong [sic] to leave before I smack somebody." [*Id.*]. The email therefore does not support Howard's claim that St. John's unfairly investigated her discrimination claims.

Howard further cites her own sworn statement that she "was shown partial video footage, but … was not shown footage that captured [her] return to the building." [ECF No. 85 at 23; ECF No. 86 at 6 ¶ 20]. Howard admits that she clocked in and briefly returned to her car. [ECF No. 85 at 11]. Whether she was shown video footage of herself returning to the building is not relevant to St. John's investigation of her discrimination claims. At bottom, Howard has not shown that St. John's intended to place her on a PIP or fire her before fully investigating her complaints of discrimination.

Fourth, Howard cannot establish pretext through her good performance reviews. "[C]hanges in an employer's estimation of its employee's job performance, without more, cannot establish pretext as a matter of law." *Roberts v. Int'l Bus. Machines Corp.*, 733 F.3d 1306, 1309 (10th Cir. 2013). "Put simply, prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual." *Id.* (citation and internal quotation marks omitted). To raise an inference of pretext, Howard would need to present evidence that St. John's dishonestly changed its evaluation of her performance. *Id.* (citing *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). Here, the evidence shows that Ms. Merciez began receiving complaints about Howard's performance soon after she arrived on the sixth floor. [ECF No. 77-9]. Howard admitted that Ms. Merciez shared negative feedback with her on a weekly basis. [ECF No. 77-1 at 9]. Although Howard

sets forth evidence that she received positive feedback on other occasions, that feedback alone does not establish that Ms. Merciez or Mr. Amagda did not actually hold the views they expressed about her performance. Therefore, she has not shown through the positive feedback she received that the reasons for placing her on a PIP or terminating her employment were pretextual.

Howard further argues that St. John's motivations for placing her on a PIP and for firing her were pretextual because, as a black nurse over 40, she was treated differently than everyone else. [ECF No. 85 at 13, ¶ 54, 15, ¶¶ 7–8, 17, ¶ 15, 19–20]. She alleges that her preceptor, J.P., came to work early without clocking in and was treated more favorably than she was. [ECF No. 85 at 19]. She also alleges that J.P. made age-related remarks in the workplace and had previous complaints filed against her for bullying. [*Id.* at 13, ¶ 54, 17 at ¶ 15]. Howard also contends that St. John's did not discipline J.B. for yelling at her in a way that is comparable to her termination. [*Id.* at 15, ¶¶ 7–8]. "[S]howing disparate treatment—by demonstrating that the employer treated employees similarly situated to the plaintiff employee differently (i.e., more favorably)—is a particularly potent instrument to discredit an employer's allegedly legitimate reasons." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1311 (10th Cir. 2017) (citation omitted). But Howard's attempt to invoke this "particularly potent instrument" fails because the

relevant inquiry asks whether "the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness[.]" *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (cleaned up). A similarly situated employee reports to the same supervisor, is held to the same standards, and runs "afoul of those standards at least to the same degree." *Roberts v. Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1310 (10th Cir. 2013). "And it falls on the employee alleging discrimination to rule out alternative explanations for the differential treatment." *Id.* (citation omitted).

Howard has put forth no evidence from which a reasonable juror could infer that she was treated differently from other similarly-situated employees. Although she points to J.B. yelling at her and J.P. working early *without pay*, neither J.B. nor J.P.'s alleged conduct show violations that are of "comparable seriousness." Howard has not identified another nurse reporting to Ms. Merciez who struggled at her job and was not placed on a PIP. Nor has she identified such an individual who Ms. Merciez did not fire after discovering they swiped their badge and then briefly left the building. Howard's conclusory assertions and characterizations in her response to the motion for summary judgment are simply not enough to carry the day.

As to timing, the record reflects some confusion about when Howard first raised her complaint of discrimination. She testified that St. John's "should

have understood" she was complaining about race discrimination in her September 19, 2023 letter. [ECF No. 77-1 at 14–15]. But this letter did not mention or even allude to age or race discrimination. [ECF No. 77-10]. In contrast to her September letter, Howard's October 7, 2023 letter shows that she complained of discrimination, using the terms "discriminatory treatment" and "racial discrimination." [ECF No. 77-23]. She was put on a PIP 10 days later. [ECF Nos. 77-22]. Though the timing of these events are close, temporal proximity, in and of itself, does not raise a genuine issue of material fact concerning pretext. *Plump*, 161 F.4th at 1236. And the Tenth Circuit "has refused to allow even very close temporal proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext." *Id.* (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006)). Therefore, "temporal proximity can support a finding of pretext only in combination with other evidence of pretext." *Id.* (quoting *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017)). Because each of Howard's other bases for establishing pretext fail, her temporal proximity argument also fails.

In sum, Howard has failed to shoulder her burden to demonstrate that St. John's reasons for placing her on a PIP and terminating her employment was pretextual for age or race discrimination. Howard has failed to present evidence to show St. John's reasons for placing her on a PIP or for

terminating her employment were false. And she has not demonstrated "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in St. John's given reasons. The Court finds that St. John's had a good faith belief that the PIP was necessary to improve Howard's work performance and that Howard was terminated for timecard falsification. Thus, St. John's is entitled to summary judgment on Howard's age and race discrimination claims.

### B. Howard also fails to present evidence of pretext for her retaliation claim.

Howard also alleges that St. John's retaliated against her after she reported discrimination. [ECF No. 70 at 9–10]. Under Title VII and the ADEA, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a); *Mauldin v. Driscoll*, 136 F.4th 984, 995 (10th Cir. 2025). To survive summary judgment on a retaliation claim, "a plaintiff must directly show that retaliatory animus played a motivating part in the employment decision, or rely on the *McDonnell Douglas* burden-shifting framework ... to prove retaliation indirectly." *Byrnes v. St. Catherine Hospital*, 158 F.4th 1107, 1113 (10th Cir. 2025) (cleaned up). "To show retaliation under Title VII and the ADEA, an employee must show (1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable

employee would have found the challenged action materially adverse, and (3) that there was a causal connection between the two." *Jiang*, 169 F.4th at 1204 (citations and internal quotation marks omitted).

Protected opposition broadly encompasses any type of communication giving notice to the employer that the employee is challenging allegedly discriminatory behavior. *Walkingstick Dixon v. Oklahoma ex rel. Regional University System of Oklahoma Board of Regents*, 125 F.4th 1321, 1339 (10th Cir. 2025) (answering employer's questions); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (filing an EEOC claim); *McCue v. State of Kansas, Dep't of Human Res.*, 165 F.3d 784, 789 (10th Cir. 1999) (filing an internal complaint). A plaintiff may establish a causal connection by showing that an adverse employment action occurred soon after the protected activity. *Walkingstick Dixon*, 125 F.4th at 1339 (quotation omitted). But "[u]nless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001) (citations omitted). If the plaintiff can establish a prima facie case of retaliation, "[t]he burden then shifts to the employer to articulate a legitimate non-retaliatory reason for taking the adverse employment action before ultimately shifting back to the plaintiff to establish that the employer's

explanation is pretextual—i.e., unworthy of belief." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

Howard alleges that St. John's retaliated against her in two ways: placing her on the PIP and terminating her employment.[3] [ECF No. 70 at 9–10; ECF No. 85 at 20–21]. For purposes of its briefing, St. John's assumes Howard can assert a prima facie case of retaliation. [ECF No. 77 at 21]. And, as shown above, St. John's has articulated legitimate, non-retaliatory reasons for placing Howard on a PIP and for terminating her employment. *See*, supra at IV, A.

To show pretext, Howard again relies on her lack of intent to falsify her time, St. John's various explanations for terminating her employment, unfair investigation, and positive performance reviews. [ECF No. 85 at 22–24]. She additionally argues that pretext is shown through timing and disparate treatment. [*Id.* at 12, ¶ 49; 17, ¶ 15; 21].

---

[3] Howard additionally argues that she was retaliated against by "denial of transfer." [ECF No. 85 at 21]. However, because she did not include this alleged adverse employment action on her EEOC Charge, it is not exhausted and therefore cannot form the basis of her claim. "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Aguilera v. Cap. One, N.A.*, No. 25-CV-0229-CVE-CDL, 2025 WL 3080781, at *5 (N.D. Okla. Nov. 4, 2025) (citing *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (overruled on other grounds)). Howard further describes "escalating criticism" and "increased scrutiny" as adverse employment actions she experienced. [ECF No. 85 at 21]. The Court construes these claims as duplicative of her claim of retaliation through issuance of the PIP.

For substantially the same reasons as outlined above, the Court finds that Howard has set forth no evidence of pretext as to retaliation. *See* supra at IV, A. St. John's has established that it had legitimate, non-retaliatory reasons for placing Howard on a PIP and for terminating her employment. In turn, Howard fails to present any evidence that would allow a reasonable juror to infer that St. John's was grasping for reasons to place her on a PIP or fire her on account of her complaints of age and race discrimination. Howard was placed on PIP for performance issues and got fired because, as she admits, she clocked into work and then left the building. *Tabor*, 703 F.3d at 1218. St. John's is entitled to summary judgment on Howard's retaliation claim.

### C. *Howard has not demonstrated a prima facie case for her hostile work environment claim.*

St. John's argues that summary judgment is proper on Howard's hostile work environment claim because she has failed to identify any severe or pervasive conduct that she experienced on account of her age or race. [ECF No. 77 at 23–25]. In response, Howard argues that she has presented sufficient evidence of a hostile work environment, and that the severity of conduct is "ordinarily a fact-intensive issue for the jury." [ECF No. 85 at 22].

"To survive summary judgment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1326–27 (10th Cir. 2004) (quotation and internal quotation marks omitted). The plaintiff "must also produce evidence from which a rational jury could infer that she was targeted for harassment because of her … race, or [age]."[4] *Id.* at 1327.

To determine whether Howard has shown sufficiently severe or pervasive conduct, the Court must look at the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or a mere offensive utterance, and whether it unreasonably interfered with work performance. *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). Critically, Howard must show the work environment was both objectively and subjectively hostile. *Id.*

St. John's argues that no remarks made to Plaintiff related to her race or age, and all the incidents she describes do not rise to the level of severe or pervasive. [ECF No. 77 at 23–25]. The Court agrees. Howard testified that she could not recall any St. John's employee making an age or race remark about or towards her. [ECF No. 77-1 at 28]. As for disparaging remarks, she

---

[4] "The same substantive standards govern hostile work environment claims under Title VII … and the ADEA." *Weathersby v. Latshaw Drilling Co., LLC*, No. 24-CV-0368-CVE-CDL, 2024 WL 4896604, at *7 (N.D. Okla. Nov. 26, 2024) (collecting cases).

pointed to J.P.'s comments about how old people "smell." [ECF No. 77-1 at 28]. This is not enough to establish a hostile work environment. As examples of harassment, Howard testified that Ms. Merciez "micromanaged" her, sabotaged her work, and provided negative feedback, while other coworkers refused to train her, gossiped about her, and yelled at her for mistakes. [ECF No. 77-1 at 32–33, 39–40]. Howard provides no evidence of Ms. Merciez sabotaging her work or of anyone refusing to train her. And her complaints of gossip, micromanaging, and being yelled at for mistakes does not establish sufficient evidence of a genuine issue of material fact as to whether St. John's created a hostile work environment.

"Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris*, 666 F.3d at 663–64 (10th Cir. 2012) (internal quotation marks and citations omitted). And "[a] plaintiff does not make a sufficient showing of a pervasively hostile work environment by demonstrating a few isolated incidents of ... sporadic ... slurs .... Instead, there must be a steady barrage of opprobrious ... comments." *Id.* at 666 (quotations and internal quotation marks omitted). The conduct Howard describes does not establish a genuine issue of material fact as to her hostile

42

work environment claim. Therefore, St. John's is entitled to summary judgment on this claim.

## V. Conclusion

For the reasons outlined above, the Court finds that St. John's is entitled to summary judgment on all of Howard's claims. Therefore, its motion for summary judgment [ECF No. 77] is GRANTED.[5] A separate judgment will enter.

DATED this 17th day of June, 2026.

_Sara Hill_

Sara E. Hill
UNITED STATES DISTRICT JUDGE

---

[5] As a result of this order, St. John's pending motion in limine [ECF No. 79] is MOOT.